James P. MITCHELL, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

Harry SORVAS, individually and doing business as Merit Protective Service, Defendant.

**Civ. A. No. 18000.**

United States District Court
W. D. Pennsylvania.

April 14, 1960.

Office of the U. S. Department of Labor, Chambersburg, Pa., for plaintiff.

Burgwin, Ruffin, Perry & Pohl, Pittsburgh, Pa., for defendant.

GOURLEY, Chief Judge.

This is an action by the United States Department of Labor to permanently enjoin the defendant from violating the minimum wage, overtime and record-keeping provisions of the Fair Labor Standards Act of 1938, as amended. 29 U.S.C.A. §§ 206, 207 and 211(c).

Two questions confront the court:

1. Is the defendant engaged in commerce or the production of goods for commerce.

2. In the event defendant is engaged in commerce or in the production of

goods for commerce, is defendant relieved from compliance for the reason that defendant's activities fall within the specific exemptions enumerated in the Act.[1]

Defendant conducts a "shopping service" business, offering retail establishments a service of investigating the honesty and efficiency of sales employees.

Defendant employs "shoppers" from the Pittsburgh area who enter divers places of business, pretending to be customers, and make observations concerning the behavior, honesty, and efficiency of the sales people of the subscriber. They then prepare reports which are delivered to the crew supervisor, who, in turn, either personally or by use of the mails forwards the reports to the Pittsburgh office.

Two or three shoppers are assigned to a supervisor and the shoppers and supervisor constitute a crew. The crews conduct shopping surveys throughout Allegheny County, the Western half of Pennsylvania, and cities in parts of Eastern Ohio, West Virginia and Kentucky.

1. Is the Defendant Engaged in Commerce?

I am satisfied that when defendant's employees transported themselves and their services regularly and recurrently across the state lines and in mailing or carrying their reports across state lines for use for further interstate communication between defendant and home offices of subscribers and Merit Protective Service Companies located outside Pennsylvania, together with the mailing, telephoning and telegraphing of messages, reports and surveys to these persons and organizations, defendant was engaged in commerce within the meaning of the Act, Mitchell v. C. W. Vollmer & Co., 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed.

1. "The provisions of sections 6 and 7 shall not apply with respect to * * * (2) any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located. A

'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry;" 29 U.S.C.A. § 213(a) (2).

1196; Tobin v. Alstate Construction Co., 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745; Mitchell v. Kroger Co., 8 Cir., 248 F.2d 935.

2. Is Defendant Exempt from the Provisions of the Fair Labor Standards Act?

In order for defendant to claim exemption three tests must be met: 29 U.S.C.A. § 213(a) (2).

1. More than one-half of the annual dollar volume of sales of goods or services must be made within the state where the business is located.

2. At least 75 per cent of the gross volume of sales of goods or services must not be for resale.

3. At least 75 per cent of sales of goods or services must be recognized as retail sales or services in the industry.

■■■ These exemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit. They are explicit prerequisites to exemption, not merely suggested guidelines for judicial determination of the employers' status, Mitchell v. Kentucky Finance Co., 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815. The burden of proof to these exemptions rests with defendant, Richter v. Barrett, 3 Cir., 173 F.2d 320.

The facts in the instant proceeding, in my judgment, are so unequivocally clear and unambiguous that reasonable men can render but one conclusion.

First, It is not disputed that less than 25 per cent of defendant's gross volume of business is earned outside of Pennsylvania, so that the first prerequisite for exemption has been met.

■■■ Second, A question might arise as to whether the customers who are referred to defendant by other Merit organizations result in transactions for resale. In my opinion these transactions are akin to referrals by attorneys. The legal work performed is not sold to the forwarding attorney who then resells it

to the client. The services are performed by the referred attorney directly to the client and the fees are divided. No wholesale transaction is contemplated. But even if I were in error in evaluating such transactions as being not in the category for resale, the total gross volume received from such transactions since 1956 has always been less than 10 per cent which is permissible under the exemption provisions of the Act.

Third, Prior to the 1949 amendments to the Act, the concept of retail sales or services was restricted to sales to the ultimate consumer. Walling v. Roland Electrical Co., 4 Cir., 146 F.2d 745. Unless the sales of goods or services were to a purchaser who intended to use the product or service for his personal or household use, such business did not qualify for the exemption. Under such a provision, sales to an ultimate consumer, who intended to use the goods or services for a commercial use did not qualify for the exemption. Boisseau v. Mitchell, 5 Cir., 218 F.2d 734; Mitchell v. T. F. Taylor Fertilizer Works, D.C., 136 F.Supp. 740.

These authorities hold to the view that as long as the purchaser is the ultimate consumer, not intending to resell, said sale in the industry is considered to be a retail sale, and the exemption is applicable.

■■■ The word retail is not defined by the Act. Given its common and ordinary acceptation when used in sales parlance, it means a sale in small quantity or direct to the consumer, as distinguished from the word wholesale, meaning a sale in large quantity to one who intends to resell. The character of the sale is not altered by the use to which the consumer may put the purchased commodity. These sales were preponderantly retail although the services sold were used subsequently for commercial purposes, White Motor Co. v. Littleton, 5 Cir., 124 F.2d 92.

A sale of plaintiff's shopping services as used by the buyer for its commercial benefit is analogous to a restaurateur

purchasing a chicken, treating it, and succulently preparing it in order to encourage more consumers and customers. The fact that this activity is extended for a commercial purpose would not render the restaurateur's business as wholesale in character.

The Government brought upon the stand a highly respected professor of a university in the Pittsburgh environs to controvert this fact based upon theoretical calculations.

The statute, however, does not direct the courts to the professorial ivory towers for a refined analysis of economic theory; rather it directs us to the industry itself for a consideration of its own understanding of what constitutes a retail sale, Mitchell v. Roberts, D.C., 179 F.Supp. 247.

On the facts of this case, I have no alternative but to conclude that a recognition exists in the industry that the sales are retail and that the defendant has sustained the burden of so showing.

I conclude, therefore, that despite the fact that defendant is engaged in commerce which would render it subject to the provisions of the Fair Labor Standards Act; nevertheless, defendant is relieved from compliance for the reason that defendant's activities fall within the specific exemptions enumerated in the Act, and that no injunction in this case should be issued.

The court makes the following findings of fact and conclusions of law:

### Findings of Fact.

1. This is an action filed by the Secretary of the United States Department of Labor requesting an injunction under the provisions of the Fair Labor Standards Act of 1938, as amended, to enjoin the defendant from violating the Minimum Wage, Over-time Record Keeping and Shipments provisions of the aforesaid Act.

2. The defendant is an individual residing in Allegheny County, Pennsylvania, owning and operating a "shopping service" business under the fictitious name of Merit Protective Service, at 304 Commonwealth Building, Pittsburgh, Pennsylvania.

3. In conducting his "shopping service" business, defendant offers to retail establishments a service of investigating the honesty and efficiency of sales employees.

4. In investigating the honesty and efficiency of sales employees engaged by retail establishments, defendant employs "shoppers" from the Pittsburgh area. Two or three shoppers are assigned to a supervisor and the shoppers and supervisor constitute a crew. The crews conduct shopping surveys throughout Allegheny County, the western half of Pennsylvania, on occasion, and in certain cities in the eastern parts of Ohio, West Virginia and Kentucky.

5. The normal procedure by which the shoppers conduct shopping surveys is as follows:

The shoppers, adopting the role of typical customers and working independently of each other, enter the place of business of a customer or subscriber of defendant and say and do things that any customer would be likely to say and do. They ask questions, they browse, they may or may not purchase an item, or if in a restaurant, they may order and consume food. While giving the impression of customers, they mentally note factors concerning the behavior, honesty and efficiency of the sales people of the subscriber. The supervisor and shoppers note the general condition of the merchandise and of the particular department of the establishment. In addition, the shopping crew watches for acts of dishonesty on the part of the employees of the subscriber. As a rule the shopping crew will perform a number of tests at the establishment of the subscriber. After completing the tests, the supervisor and shoppers leave the establishment. Generally, they proceed directly to a car or some other place outside the view of the subscriber's employees and write their respective reports. Each member of the shopping crew prepares

a separate report for each of the tests conducted. In writing their respective reports of the test made, the supervisor and shoppers use specially prepared forms which may vary as to content depending on the nature of the establishment investigated.

6. The reports which are generally completed by the shoppers are as follows:

1. *Sales Efficiency Report*—This report enables the customer to determine at a glance the weaknesses and efficiency of his sales personnel. The form used for department stores, specialty shops, and general stores supply detailed, specific information about the sales person tested, emphasizing the following factors:

    a. Approach to Customer

    b. Securing Attention

    c. Attitude Toward Customer

    d. Appearance of Sales Person

    e. Manner of Wrapping Merchandise

    f. Promptness in Completing Sale

    g. Compliance with Store System

    h. Remarks of Sales Person at Completion of Sale

The Sales Efficiency Report is a "checksheet" type of report which is used to reflect on paper the observations made by the supervisor or shopper while acting as a customer in the subscriber's establishment.

2. *Violation Report*—A test purchase made by a member of the shopping crew may disclose that the money paid for the purchase was not properly recorded or that a receipt for the purchase was not issued in accordance with the regulations of the subscriber's store. This information regarding such an irregularity is used in preparing a Violation Report. After having verified the violation, the crew supervisor reports the irregularity to the management at the place of business being investigated and tested.

3. *Merit Salesmanship Analysis*—This report analyzes and grades on a percentage basis, a sales person on the following factors:

    a. Approach—Initial Impression

    b. Merchandise Knowledge

    c. Suggestive Selling & Sales Ability

    d. Compliance with Store System

Other factors analyzed but not graded on the Merit Salesmanship Analysis Report are:

    a. Register Procedure

    b. Administrative Condition of Store or Department

    c. Close and Final Impression

    d. Remarks

4. *Merit Service Analyzer*—The report emphasizes three factors: Approach and initial impression; service and improving selling ability, and comparisons with system regulations. It is a check sheet on a "yes" or "no" basis and calls for a clarification of all "no" answers by the supervisor or shopper. It does not grade sales persons.

5. *Service Report*—This report serves a two-fold purpose. It shows the nature, quantity, and price of merchandise purchased in the test and rates the sales person on fifteen separate factors.

7. The crew travels in the car of the supervisor. After an establishment is checked, the shoppers return to the car and complete their reports. The shoppers admitted that upon completion, all of the reports are delivered to the supervisor and the crew then proceeds to the next store to be surveyed.

8. The supervisor after collecting all of the reports will do one or two things—first, as is generally the case, he will retain the reports and deliver them to defendant's office upon completing the trip; secondly, if there is any urgency in delivering the reports to the customers of defendant, the supervisor will mail the reports to Pittsburgh. In either case, after the reports have been checked by Mr. Sorvas or the supervisors, they are forwarded to the customers or subscribers. Most of the reports are mailed to locations in Pennsylvania, but defendant admits that some of the reports are sent to customers located outside of the State.

9. In the event that the shoppers purchase any merchandise at the retail establishment, such items are placed in the car of the supervisor who delivers them to defendant's place of business in Pittsburgh. The defendant thereafter packages said items and returns them to the customers by parcel post.

10. After the last survey is completed on a particular trip and the shoppers have completed their reports and delivered them to the supervisor, the supervisor returns to defendant's office in Pittsburgh.

11. Defendant's customers are predominantly located in Pennsylvania so that most of the trips taken by the crews are through Allegheny County and the western part of Pennsylvania. The out of state customers require a monthly trip through Ohio, three trips per year through West Virginia and one trip per year through Kentucky. The income received from out of state customers for the period from 1956 to the present time constitutes between 20 per cent and 25 per cent of defendant's gross annual volume of business. During the period from 1956 to the present time, more than 50 per cent of defendant's annual volume of business was received from customers located in Pennsylvania.

12. The defendant operates his business as a sole proprietorship and is not a subsidiary of or associated with any of the other Merit Protective System companies in other parts of the country. These firms or corporations are owned and operated as sole proprietorships, corporations or are operating under franchises from the original Merit Protective Corporation which is located in New York.

13. Some of the defendant's customers are referred to him by other Merit Protective System organizations. In the event that another corporation signs up a subscriber with stores in territories surveyed by the defendant, the other organization will refer those stores to the defendant. Defendant will shop and survey said stores and will enter into a fee-splitting arrangement with the forwarding organization. In general, whatever fees are received are split on a 90 per cent—10 per cent basis, 90 per cent being paid to the defendant and 10 per cent being retained by the forwarding organization. Clients which are handled on this basis constitute approximately 10 per cent of defendant's gross volume of sales for the period from 1956 to the present time.

14. According to the testimony of the defendant who has conferred with other persons in the shopping service industry, the type of service which he performs on behalf of retail establishments is considered to be retail or service in the shopping service industry.

15. According to George Krohe, Vice President of Isaly Dairy Company, one of the clients of defendant, the type of service performed by defendant on behalf of retail establishments is considered in the shopping service industry as retail or service. This witness had experience with two other shopping service companies performing similar services and was qualified, therefore, to testify as to how the particular services were considered in the shopping service industry.

16. The Government produced as its witness to prove the nature of defendant's business Dr. Entenberg of the University of Pittsburgh. The Professor indicated that he had not considered this matter with any representatives of the industry and was therefore testifying only as to his discussions and conclusions reached with other professors who were teaching in the retail field.

### Conclusions of Law

1. Jurisdiction of this cause of action and of the parties herein is conferred upon the Court by Section 17 of the Fair Labor Standards Act of 1938, as amended (29 U.S.C.A. § 201 et seq.) and by Section 41(8) of the Judicial Code, Revised, effective September 1, 1948 (28 U.S.C.A. § 1337).

2. Defendant is engaged in commerce or the production of goods for commerce.

3. Defendant's sales are recognized as retail sales of services in the shopping service industry.

4. Defendant's business, as a retail and service establishment, is exempt from the provisions of the Fair Labor Standards Act of 1938, as amended.

An appropriate order is entered.